UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

KIMBERLY JO S.,[1]             Case No. 1:20-cv-1035

    Plaintiff,             Black, J.
                                                                Bowman, M.J.

    v.

COMMISSIONER OF SOCIAL SECURITY,

    Defendant.

**REPORT AND RECOMMENDATION**

Plaintiff Kimberly Jo S. filed this Social Security appeal in order to challenge the Defendant's finding that she is not disabled. *See* 42 U.S.C. § 405(g). Proceeding through counsel, Plaintiff presents two claims of error for this Court's review. The Commissioner's finding of non-disability should be AFFIRMED because it is supported by substantial evidence in the record as a whole.

**I. Summary of Administrative Record**

On August 9, 2018, Plaintiff filed an application for Disability Insurance Benefits ("DIB"), alleging she became disabled on March 29, 2018, based upon a combination of anxiety, bipolar disorder, and several bilateral foot problems as well as bilateral knee replacements. (Tr. 74, 218). After her claim was denied initially and upon reconsideration, Plaintiff requested an evidentiary hearing before an Administrative Law Judge ("ALJ").

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials. *See* General Order 22-01.

1

On February 19, 2020, Plaintiff appeared with counsel by video and gave testimony before ALJ John Wood; a vocational expert ("VE") also testified. (Tr. 33-67). On March 11, 2020, the ALJ issued an adverse written decision, concluding that Plaintiff was not disabled. (Tr. 12-32). The Appeals Council declined further review, leaving the ALJ's decision as the final decision of the Commissioner. Plaintiff then filed this judicial appeal.

Plaintiff was 46 years old on her alleged disability onset date, and remained in the same "younger individual" age category on the date of the ALJ's decision. She has a high school education and previously worked as a retail store manager, floral designer, stock clerk and cashier. (Tr. 25). She lives with her husband in a mobile home and has a small dog.

The ALJ determined that Plaintiff has severe impairments of "anxiety, depression, spine disorder, degenerative arthritic hips, osteomyelitis, degenerative right shoulder, right carpal tunnel, and obesity." (Tr. 17). The impairment of obesity is not a listed impairment but the ALJ indicated that he considered the impact of Plaintiff's obesity in determining that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 17-18).

Plaintiff does not challenge the foregoing findings in this judicial appeal. However, she does challenge the ALJ's assessment of her residual functional capacity ("RFC"). The ALJ determined that Plaintiff could perform sedentary work, subject to the following limitations:

> she is unable to climb ladders, ropes, or scaffolds; she is limited to occasional balancing, stooping, crouching, crawling, kneeling, and climbing ramps or stairs; she must avoid hazards and cannot perform overhead reaching with the dominant (right) upper extremity; she is limited to frequent performance of other manipulative functions; she is unable to operate foot controls; she is limited to understanding simple and routine instructions; she

2

>is limited to performing simple and routine tasks on a sustained basis with little or no change in work settings or duties; she is unable to interact with the general public; she is able to occasionally interact with coworkers and supervisors.

(Tr. 21).

Based upon her RFC and testimony from the vocational expert, the ALJ concluded that Plaintiff could not perform her prior work but still could perform other jobs that exist in significant numbers in the national economy, including production inspector, production worker, and hand packager. (Tr. 26). Therefore, the ALJ determined that Plaintiff was not under a disability. (*Id*.) Plaintiff urges this Court to reverse, arguing that ALJ erred in evaluating her mental limitations when: (1) he failed to accurately assess her subjective symptoms; and (2) improperly rejected portions of three psychological opinions. Plaintiff does not challenge the assessment of her physical RFC.

## II. Analysis

### A. Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability." *See* 42 U.S.C. §1382c(a). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation

omitted). In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.... The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

In considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his or her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Com'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

A plaintiff bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits. 20 C.F.R. § 404.1512(a). A claimant seeking benefits must present sufficient evidence to show that, during the relevant time period, she suffered an

4

impairment, or combination of impairments, expected to last at least twelve months, that left her unable to perform any job. 42 U.S.C. § 423(d)(1)(A).

### B. Plaintiff's Claims

### 1. The ALJ's Analysis of Subjective Symptoms

In her first claim, Plaintiff challenges the ALJ's evaluation of her subjective reports that she was disabled by her mental impairments. The ALJ determined that Plaintiff's subjective complaints were "not entirely consistent with the objective medical evidence and other evidence in the record." (Tr. 22). The ALJ described inconsistencies with respect to both physical and mental complaints. (*Id.*) Plaintiff suggests that a factual error renders the ALJ's "analysis of the consistency of her reported mental health symptoms" to be "inherently unreliable." (Doc. 10 at 15, PageID 1737). Specifically, although the ALJ repeatedly stated that she left her last job not for mental reasons but due to physical reasons, (Tr. 19, 23, 24), Plaintiff maintains that she left the position based upon her mental limitations.

An ALJ's assessment of subjective symptoms is generally given great deference. *See Walters v. Com'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). In fact, a credibility/consistency determination[2] cannot be disturbed "absent a compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). Thus, it is proper for an ALJ to discount the claimant's testimony where there are inconsistencies and contradictions

---

[2] An ALJ's assessment of symptoms, formerly referred to as the "credibility" determination in SSR 96-7p, was clarified in SSR 16-3p to remove the word "credibility" and refocus the ALJ's attention on the "extent to which the symptoms can reasonably be accepted as <u>consistent</u> with the objective medical and other evidence in the individual's record." SSR 16-3p, 2017 WL 5180304 at *2 (October 25, 2017) (emphasis added).

5

among the medical records, his testimony, and other evidence. *Warner v. Com'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004).

The undersigned does not agree that the ALJ's analysis of Plaintiff's subjective symptoms was marred by factual error. Plaintiff testified that she worked part-time at a floral store for two years prior to her alleged onset of disability. (Tr. 39). She testified that she had applied for a full-time position with the store because it was a new business, but due to the limited number of positions and others all "competing," she was only hired part-time.[3] (*Id.*) She testified that she "had to resign" due to a foot surgery that ended up with an open wound, and the need to have significant treatment including two surgeries prior to reconstruction of her foot. (Tr. 40). The ALJ inquired: "So knowing how that was going to be happening, then, you realized you couldn't work there anymore, and resigned?" Plaintiff answered affirmatively that due to her schedule of surgeries and treatment, "I knew that they couldn't support a job that I wouldn't be at for that long." (*Id.*) Plaintiff additionally testified, in response to the ALJ's questioning, that she did not believe she could return to that position due to her physical issues. (Tr. 41).

The above testimony alone demonstrates that the ALJ's resolution of this issue is substantially supported. Plaintiff does not dispute the referenced testimony but instead points to other, more favorable testimony. For example, in response to the ALJ's query as to why she could no longer work any job (rather than just the floral job), she testified that it was due to a combination of physical and mental impairments. (Tr. 42). Plaintiff also testified about the stress of working as a manager for nearly 10 years prior to her

---

[3]Although Plaintiff testified that the job was part-time, her earnings record reflects that her income was at the substantial gainful activity level in 2016. However, her income dropped slightly below SGA in 2017, and was well below SGA in 2018 after she resigned in March of that year.

6

work at the floral shop, and that she tried to commit suicide in 2009 due to stress at that time. (Tr. 41-42). However, when the ALJ asked Plaintiff whether she could perhaps work an unskilled factory job without managerial responsibilities, where she would sit most of the time, wouldn't have to lift more than 10 pounds, and wouldn't have to work with the public with minimal interaction with people, Plaintiff testified "hypothetically, it sounds ideal." (Tr. 43-44).

Still, Plaintiff points to a statement in her function report that she resigned her prior job "because it was mentally to[o] much for me to handle." (Tr. 234). But it is clear in context that Plaintiff was referring to the managerial job and not her most recent job. On the same form, she states that after her resignation from the stressful job, she "took a part-time job with less stress." (*Id.*) She states that her symptoms in that job were "not as intense" until she had to have multiple surgeries which "sent me into a mental state." (Tr. 234). She further reports that she then resigned because the store was too "big for me to walk and…I was nonweight [bearing]." (*Id.*) Thus, the function report also supports the ALJ's conclusion that she resigned her last position due solely to physical issues.

Plaintiff next cites to clinical records that documented reports that she had been feeling overwhelmed at work and people had noticed, and that her anxiety was triggered by work. (Tr. 726, 735, 757). However, those reports were dated prior to her alleged onset of disability and once again were in reference to her managerial job – not the less stressful position that she held for two years prior to her resignation.[4] Last, Plaintiff points to her report to an examining psychologist that she'd left the work force due to a combination of physical and mental issues. (Tr. 1236). However, the ALJ was not

---

[4] In addition, one of the referenced records states that she reported "doing well" with added stress of a promotion. (Tr. 735).

7

required to find that single report outweighed contrary evidence that supported his finding that Plaintiff left her most recent job due to physical issues. The narrow scope of judicial review of the Commissioner's final administrative decision does not include re-weighing evidence, deciding questions of credibility, or substituting the court's judgment for that of the ALJ. *See Ulman v. Commissioner,* 693 F.3d 709, 713 (6th Cir. 2012).

In addition to concluding that the ALJ's resolution of this factual discrepancy was substantially supported, the undersigned finds the ALJ's other reasons for discounting Plaintiff's subjective reports of incapacitating mental limitations to be substantially supported. In this appeal, Plaintiff is highly critical of the ALJ's reference to the lack of objective evidence to support her allegations including the lack of "intellectual functional testing or inventory personality testing." (Tr. 22). She argues that "clinical and laboratory data may consist of diagnosis and observations of professionals trained in the field of psychopathology," and that "testing" is not always required. (Doc. 10 at 15, PageID 1737, citing *Mebane v. Com'r*, 382 F. Supp.3d 718, 723 (S.D. Ohio June 10, 2019).

Plaintiff's point is well-taken, but does not provide a basis for reversal in this case. It is true, as the Sixth Circuit stated in *Blankenship*, that "[a] psychiatric impairment is not as readily amenable to substantiation by objective laboratory testing as a medical impairment." *Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989) (internal quotation and citation omitted). In that sense and absent any expert testimony to the contrary, any suggestion by the ALJ that an IQ test or a "personality inventory" test was required to diagnose Plaintiff's mental impairments or level of severity was off-base. "When mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals trained in the field of psychopathology." *Id.*

8

However, the undersigned finds no reversible error here because the ALJ did not rely on a lack of "testing" as the only "objective" evidence that was inconsistent with Plaintiff's subjective complaints. In *Mebane*, the case cited by Plaintiff, remand was required because the ALJ ignored consistent objective observations by mental health providers such as mental status exams that supported Plaintiff's subjective complaints. By contrast, the ALJ in this case cited to multiple instances throughout Plaintiff's mental health records in which her treating providers recorded generally *normal* mental status findings, including clear speech, logical thought processes, normal perceptions, normal insight and judgment, intact memory, normal attention span and concentration, appropriate behavior, and no suicidal ideation. (Tr. 20; *see also* Tr. 712, 807, 1544, 1573, 1605-06). In addition, her treating providers consistently described her impairments as "moderate" rather than severe. (Tr. 20, 22; *see also* Tr. 783, 793, 803, 1276, 1570). Thus, the ALJ here relied most heavily on the type of evidence that the Sixth Circuit has acknowledged is often most relevant in the diagnosis of mental impairments.

The ALJ acknowledged Plaintiff's testimony that she has been in treatment for 18 years, and discussed Plaintiff's "conservative" care and lack of disabling side effects from her medication. (Tr. 22) The ALJ noted that Plaintiff herself reported that she has improved mentally even though she still experiences panic attacks and tearfulness at times such as when anticipating a significant event, and that her symptoms increase with conflict, stress, and social interactions. (Tr. 19; Tr. 52-53, 1541, 1626). The ALJ also discussed the assessment throughout her mental health records of a Global Assessment of Functioning ("GAF") score of 50, and that she had become more isolated over time and relied on her husband for more assistance with activities of daily living (such as picking up groceries and other household chores) than she had in the past. (Tr. 20). However,

9

the ALJ's mental RFC - limiting her to unskilled work, only simple and routine tasks with little or no changes in work setting or duties, no contact with the general public and only occasional interaction with coworkers or supervisors – reflects much of that evidence. Notably, the mental RFC as determined precludes all of Plaintiff's past work.

Another factor that the ALJ cited as inconsistent with Plaintiff's subjective complaints was her reported daily activities. Despite being more isolated and requiring more help, Plaintiff reported visiting regularly with her mother and a granddaughter, and that she has a best friend. (Tr. 19, 238). She exercises, drives, shops online, handles financial affairs, and crochets at times. (*Id.*, Tr. 18). On her function report, Plaintiff reported that she takes care of personal needs, watches TV, crochets "when in the mood", fixes dinner, and occasionally goes to the store "for short lists." (Tr. 234). She described crocheting and watching TV "fairly well" and "often." (Tr. 238). She reported she dusts, loads the dishwasher, and does laundry 2-3 times per week. (Tr. 236). She also camps in a camper but less often than she used to. (*Id.*) She texts and send pictures by text with her friend and attends church on "most Sundays" so long as "not in a depressed state." (Tr. 238). She also attends her granddaughter's soccer games. (Tr. 239).

Plaintiff complains that the ALJ erred in considering those activities, because "somewhat minimal daily functions are not comparable to typical work activities." *Rogers v. Com'r*, 486 F.3d 234, 248 (6th Cir. 2006). But the ALJ never equated the two. Instead, he simply considered the activities in the evaluation of her subjective complaints, as was appropriate. (Tr. 22-23); *see also* Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *7-8 (listing daily activities as one of seven factors to be considered in evaluating the consistency of subjective complaints). In short, the ALJ's evaluation of Plaintiff's subjective symptoms was not based on factual error, but rather, reflects the ALJ's

10

reasonable weighing of the evidence presented before him. That analysis is substantially supported by the record as a whole.

### 2. The ALJ's Evaluation of Opinion Evidence

In her second claim, Plaintiff asserts error in the evaluation of the opinions of three examining and consulting psychologists: Drs. Foulk, Zeune, and McKinney. Again I find no error.

On October 17, 2018, Regina McKinney, Psy.D., conducted a clinical interview, in which Plaintiff reported a remote history of two suicide attempts for which she was hospitalized (in 2001 and 2009).[5] During the interview, she "cried excessively" and reported frequent crying spells. (Tr. 1236). However, Plaintiff also reported that she still attends church, visits regularly with her mother, has a best friend, and enjoys visiting with her granddaughter. Noting that Plaintiff reported "significant difficulty retaining relationships," a tendency "to be overly sensitive to criticism" and to be "easily overwhelmed," Dr. McKinney diagnosed major depressive disorder, "recurrent and severe," and an unspecified personality disorder with borderline traits. (Tr. 1238). Based upon her evaluation, Dr. McKinney hypothesized that Plaintiff's depressive symptoms "*may* contribute to a slowed work pace." (Tr. 1239) (emphasis added). Dr. McKinney explained that even through Plaintiff exhibited "marginally adequate" skills in attention and concentration during the clinical evaluation, those skills "may deteriorate over extended time periods slowing her performance in completing simple repetitive tasks." (1239). She further opined:

> [D]ay to day work stress could lead to increased depressive symptomatology including crying, withdrawal, slowed work performance and poor frustration tolerance. She has reportedly attempted suicide twice

---

[5]Both attempts occurred many years before the alleged onset of disability.

11

> and was psychiatrically hospitalized twice. Despite using psychotropic medication and attending counseling sessions, her mental health symptoms appear severe. She appears to be lacking adequate coping skills to manage the demands associated with a full-time work schedule.

(Tr. 1239). Apart from opining that Plaintiff "appears" to lack coping skills to manage full-time work, Dr. McKinney did not translate her relatively vague opinions into functional limitations.

The ALJ found Dr. McKinney's assessment to be "not persuasive" because it was not supported by Plaintiff's own reports during the interview or consistent with the record. "This assessment is… totally inconsistent with the claimant's description of her activities … and was inconsistent with the results of mental status examinations conducted over a period of time by an attending advanced practical nurse; these examination results showed no evidence that the claimant was lacking adequate coping skills to manage a full-time work schedule." (Tr. 23-24). The ALJ also contrasted Dr. McKinney's limited "one day" evaluation and her diagnosis of "severe" mental impairment with multiple longitudinal mental health records that consistently found only "moderate" symptoms:

> [M]ental status examinations conducted by the claimant's attending advanced practical nurse since the alleged onset date of disability show the claimant to be functioning significantly better than that reported by the one-time psychological examiner; the claimant's attending advanced practical nurse has not reported that the claimant lacks adequate coping skills consistent with the current residual functional capacity assessment. This assessment is also inconsistent with other factors such as that the part-time job the claimant had for two years before her alleged onset date was a skilled job that the claimant only gave up for physical reasons. The opinion that the claimant is lacking adequate coping skills to manage the demands associated with a full-time work schedule by a psychologist, who examined the claimant on one day only, October 17, 2018, is unpersuasive.

(Tr. 24).

Two agency reviewing psychologists, Drs. Foulk and Zeune, reviewed Dr. McKinney's report and other records. (*See* Tr. 81). Dr. Foulk noted that the symptoms

12

and limitations alleged in the clinical interview with Dr. McKinney "are not fully substantiated by the medical evidence" and "are not consistent with hx [history] per the TS [treating source] Evidence." (Tr. 86; *see also id*. "Presentation at [consulting exam] …was not fully consistent with clmt's reported [symptoms] and was not consistent with presentation at …[office visits]"). Dr. Foulk assessed no limitations in understanding and memory, and no limits in Plaintiff's ability "to carry out very short and simple instructions." (Tr. 85). However, she opined that Plaintiff has moderate limitations in the ability to maintain attention and concentration for extended periods, to work in coordination with or in proximity to others without being distracted by them, to complete a normal workday and workweek, and to perform at a consistent pace without an unreasonable number and length of rest periods. (*Id*.) Despite those limitations, Dr. Foulk opined that Plaintiff could complete unskilled work activity so long as limited to 1-3 steps with only "some moderately complex tasks" and with no fast pace or high production rates. (Tr. 85). Dr. Zeune fully agreed with Dr. Foulk's assessment. (Tr. 104).

Unlike the opinion of Dr. McKinney, the ALJ found the opinions of Drs. Foulk and Zeune to be "generally persuasive." (Tr. 23). With respect to Paragraph B findings (used only at Step 3 to evaluated listing level severity), the ALJ explained he found only "mild, rather than moderate limits in [Plaintiff's] ability to adapt and manage herself, as evidenced by the mental status examinations recently conducted by the claimant's attending advanced practical nurse as well as the testimony of the claimant at the hearing." (*Id*.) Plaintiff argues that the ALJ failed to consider her allegations of daily crying spells. But the ALJ reasonably explained the body of substantial evidence that supported a "mild" level of limitation in the Paragraph B area of adapting or managing oneself. (*See* Tr. 20-21, explaining that Plaintiff is able to attend to her own needs, cook, shop, pay bills

13

and perform household tasks if necessary, does not require a personal assistant or in home help, drives a car, maintains an independent lifestyle, and has been able to adapt to increased physical problems fairly well). To the extent that the ALJ's analysis of the Paragraph B criteria is relevant to the separate assessment of Plaintiff's RFC, the undersigned finds it to be substantially supported.

Turning more specifically to Plaintiff's mental RFC, the ALJ agreed with Drs. Foulk and Zeune that Plaintiff could perform unskilled work with some limitations, but disagreed with the limitation "to jobs that do not require fast-paced production." The ALJ found that opinion to be not supportable or consistent, citing "the longitudinal medical record of benign mental status examinations, as well as other factors such as the part-time job the claimant had for two years before her alleged onset date of disability was a skilled job that she only gave up for physical reasons." (Tr. 23). Plaintiff primarily cites the alleged "factual error" that she gave up her prior job for physical reasons. For the reasons previously discussed, the undersigned rejects Plaintiff's assertion of factual error in that regard. Moreover, Plaintiff testified that a "factory job" of the variety described by the ALJ would be "ideal." Based on the record as a whole, the undersigned concludes that the ALJ's analysis of the opinion evidence is both reasonable and substantially supported.

### III. Conclusion and Recommendation

For the reasons stated, **IT IS RECOMMENDED THAT** the decision of the Commissioner be **AFFIRMED** as supported by substantial evidence and that this case be **CLOSED**.

    *s/Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| KIMBERLY JO S., | Case No. 1:20-cv-1035 |
| Plaintiff, | Black, J. |
| | Bowman, M.J. |
| v. | |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

**NOTICE**

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).